## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH

| | |
|---|---|
| ROCKY MOUNTAIN WILD; NATIONAL PARKS CONSERVATION ASSOCIATION; CENTER FOR BIOLOGICAL DIVERSITY; and WILDEARTH GUARDIANS,<br><br>      Plaintiffs,<br><br>v.<br><br>DAVID BERNHARDT, in his official capacity as Acting Secretary of the Interior; and BUREAU OF LAND MANAGEMENT,<br><br>      Defendants,<br><br>and<br><br>AMERICAN PETROLEUM INSTITUTE; INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA; UTAH PETROLEUM ASSOCIATION; STATE OF UTAH,<br><br>      Intervenor-Defendants. | **MEMORANDUM OPINION AND ORDER**<br><br><br><br>Case No. 2:19-cv-00929-DBB-CMR<br><br>District Judge David Barlow |

This matter is before the court on Petitioners' Petition for Review of Agency Action.[1] Plaintiffs challenge the Bureau of Land Management's (BLM) authorization and issuance of 59 leases of public land in the Uinta Basin for oil and gas exploration. Having considered the parties' briefing, the administrative record, oral argument, and relevant law, the court grants in part Petitioners' requested relief.

---

[1] ECF Nos. 1, 30.

# I. STANDARD OF REVIEW

In its review of agency action, the court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[2] "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made."[3]

> An agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.[4]

"When called upon to review factual determinations made by an agency as part of its NEPA process, short of a 'clear error of judgment' we ask only whether the agency took a 'hard look' at information relevant to the decision."[5] "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action."[6] In sum, the court's review is "highly deferential" to the agency action.[7]

# II. STATUTORY SETTING

Congress enacted the National Environmental Policy Act of 1969 (NEPA) recognizing the "profound impact" of human activity on the natural environment, "particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource

---

[2] 5 U.S.C. § 706(2)(A).

[3] *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (citation and internal quotation marks omitted).

[4] *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (citation and internal quotation marks omitted).

[5] *Id.*

[6] *Citizens' Comm. to Save Our Canyons*, 513 F.3d at 1176 (citation and internal quotation marks omitted).

[7] *Id.* (citation and internal quotation marks omitted).

exploitation, and new and expanding technological advances."[8] "The centerpiece of environmental regulation in the United States, NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives."[9] "NEPA has two aims . . . , it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action" and "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."[10] It is "strictly a procedural statute" and does not require substantive results.[11]

"Before embarking upon any 'major federal action,' an agency must conduct an environmental assessment (EA) to determine whether the action is likely to 'significantly affect the quality of the human environment.'"[12] Where the proposed action is not likely to significantly affect the environment, the agency may issue a finding of no significant impact (FONSI) explaining the findings and the reasons why an environmental impact statement (EIS) will not be prepared.[13] "[I]nherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process."[14]

On the other hand, if the EA suggests significant environmental impact from the proposed action, the agency must prepare a more rigorous EIS exploring the negative impacts to

---

[8] 42 U.S.C. § 4331(a).

[9] *Richardson*, 565 F.3d at 703.

[10] *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1236–37 (10th Cir. 2011) (citation and internal quotation marks omitted).

[11] *Id.*

[12] *Richardson*, 565 F.3d at 703 (brackets omitted) (quoting 42 U.S.C. § 4332(2)(C)).

[13] 40 C.F.R. § 1508.13.

[14] *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004).

aid the decision-making process. The goal of an EIS is to "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."[15] An assessment of reasonable alternatives is necessary in both an EA and EIS.[16] Where an agency has already prepared a broader NEPA analysis such as an EIS, it may "tier" a narrower future analysis to it in order to avoid duplicating work.[17] If it determines an existing EIS adequately covers the impacts from the proposed action, the agency may prepare a Determination of NEPA Adequacy (DNA) that relies on the earlier NEPA analysis.[18]

Relevant to the agency decision in this case, the Mineral Leasing Act (MLA) authorizes the Secretary of the Interior to lease land for mineral development, including oil and gas.[19] This authority has been delegated to BLM.[20] However, its decision to offer mineral leasing must comply with a management plan adopted under the Federal Land Policy and Management Act (FLPMA). BLM is tasked with managing public lands "under principles of multiple use and

---

[15] *Citizens' Comm. to Save Our Canyons*, 513 F.3d at 1178 (quoting 40 C.F.R. § 1502.1).

[16] NEPA requires consideration of alternatives in any "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(C), and in any "proposal which involves unresolved conflicts concerning alternative uses of available resources," *id.* § 4332(E). An EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

[17] *See* 40 C.F.R. § 1508.28.

[18] *See* 43 C.F.R. § 46.120(c) ("An existing environmental analysis prepared pursuant to NEPA and the Council on Environmental Quality regulations may be used in its entirety if the Responsible Official determines, with appropriate supporting documentation, that it adequately assesses the environmental effects of the proposed action and reasonable alternatives. The supporting record must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects.").

[19] *See generally* 30 U.S.C. §§ 181–287.

[20] 43 C.F.R. § 3100.0-3.

sustained yield."[21] Among other things, Congress has defined "mineral exploration and production" as a "principal or major use[]."[22]

### III. BACKGROUND

BLM prepared a resource management plan (RMP) in 2008 "to provide a comprehensive framework for public land management within the jurisdiction of the [Vernal Field Office] and its allocation of resources pursuant to the multiple-use and sustained yield mandate of FLPMA."[23] The 2008 RMP considered five alternatives, including a no-action alternative, and ultimately opened approximately 1.7 million acres in the Uinta Basin to oil and gas development.[24]

Following a nomination of parcels for leasing for oil and gas exploration, BLM provided notice for a December 2017 competitive lease sale of parcels over approximately 94,000 acres and engaged in additional NEPA review.[25] It prepared an EA assessing several direct, indirect, and cumulative impacts of leasing 64 of these parcels.[26] Among other impacts, BLM analyzed air quality and greenhouse gas emissions using a reasonably foreseeable development scenario (RFD) under which it anticipated at least one well on each parcel and 135 wells in total, with a total surface disturbance of 590 acres.[27] The purpose of the EA was "to respond to the nominations or expressions of interest for oil and gas leasing on specific federal mineral estate

---

[21] 43 U.S.C. § 1732(a).

[22] *Id.* § 1702(*l*).

[23] AR000015; 43 C.F.R. § 1601.0-5(n).

[24] AR000043–44. Approximately 200,000 acres were made unavailable to oil and gas leasing and the approximately 1.7 million available acres were divided into three different categories based on the severity of restrictions (stipulations) to be imposed on surface disturbing activities. *Id.*

[25] *See* 43 C.F.R. §§ 3120.5-1 to 3120.5-3; AR005985.

[26] *See generally* AR017415–17763.

[27] AR017428.

through a competitive leasing process."[28] In addition to the proposed leasing action, BLM

considered a no-action alternative under which it would "defer all nominated lease parcels."[29]

The EA states that BLM considered no other alternatives on the grounds that none "would meet

the purpose and need of the Proposed Action."[30]

In the EA, BLM observed that portions of the Uinta Basin (from two air quality

monitoring sites) recorded "numerous exceedances of the 8-hour ozone standard during the

winter months."[31] It noted in response to a comment, however, that a regulatory ozone model

was "impractical" for the area.[32] It also stated:

> [Two year-round air quality monitoring sites near Vernal, Utah] have recorded
> numerous exceedances of the 8-hour ozone standard during the winter months
> (January through March since 2010, except 2012). High wintertime
> concentrations of ozone are being formed under a "cold pool" process. This
> process occurs when stagnate air conditions form with very low mixing heights
> under clear skies, with snow-covered ground, and abundant sunlight. These
> conditions, combined with area precursor emissions (NOx and VOCs), can create
> elevated concentrations of ozone at ground-level. The high numbers did not occur
> in January through March 2012 due to a lack of snow cover. This phenomenon
> has also been observed in similar locations in Wyoming. Winter ozone formation
> is a newly recognized issue, and the methods of analyzing and managing this
> problem are still being developed. Existing photochemical models are currently
> unable to reliably replicate winter ozone formation. This is due to the very low
> mixing heights associated with unique meteorology of the ambient conditions.
> Further research is needed to definitively identify ozone precursor sources that
> contribute to observed ozone concentrations.[33]

BLM incorporated an earlier model—the Air Resource Management Strategy (ARMS)—

assessing potential future impacts from oil and gas activity.[34] ARMS noted that "[e]missions

---

[28] AR017422.

[29] AR017432.

[30] AR017433.

[31] AR017436.

[32] AR001517.

[33] AR017436.

[34] *See* AR017491; AR028994 (Air Resources Management Strategy (ARMS)).

from oil and gas development on the Colorado Plateau are likely contributing to monitored elevated levels of ozone; in some locations at levels above the NAAQS," and generally suggested minimum and enhanced air pollution controls be applied to oil and gas rigs and operations.[35]

Although its assessment of ozone was not extensive, BLM evaluated other air pollutants in more depth. Considering its RFD, BLM estimated emissions from a variety of air pollutants related to development and production of the anticipated 135 wells, including pollutants related to ozone.[36] For example, BLM estimated that the total nitrogen oxide emissions, a precursor to ozone formation, would be 2,214 tons per year.[37]

In addition to the impact of the wells, the extracted oil and gas will emit greenhouse gases through its eventual combustion. These indirect "downstream emissions" were also considered by BLM in its EA.[38] Based on a history of production in the area, the agency estimated the average lifetime production of oil wells, 24,120 barrels, and gas wells, 421,302 MCF.[39] Accepting previously calculated emissions factors of 0.43 metric tons of $CO_2$/barrel and 0.054717 metric tons of $CO_2$/MCF of gas, BLM generally identified the downstream greenhouse gas emission impact of 135 projected wells.[40] With these factors, BLM projected an estimated 33,423.94 metric tons per well over its lifetime.[41]

---

[35] AR029000.

[36] AR017466.

[37] AR017466.

[38] *See* AR017472. BLM only calculated carbon dioxide emissions based on combustion of the product.

[39] AR017472. MCF is 1,000 cubic feet.

[40] AR017472. This is $CO_2$ emitted based upon combustion of the product. However, BLM notes that the oil or gas product may be put to other uses that might alter the actual downstream emissions.

[41] AR017472.

BLM acknowledged that the factors and specifics of development and production could not accurately be determined at the leasing stage because of the "significant uncertainty" of construction, transportation, technology employed at the well sites, and production volume.[42] BLM also noted that additional "NEPA analysis would be conducted at the [Application for Permit to Drill (APD)] stage, when specific development details with which to analyze potential [greenhouse gas] emissions are likely to be known."[43] That is, although BLM broadly analyzed the estimated impacts of development following the lease sales in the EA, the precise details of development would not be known until leaseholder applications are submitted for development authorization. Nevertheless, BLM observed that "[a]pproval of all operations will be in conformance of the [2008] RMP, and contingent upon the operators' compliance with all applicable laws and regulations."[44]

BLM evaluated 64 parcels in its EA.[45] However, BLM removed parcel 70, deferred parcels 49, 69, and 73, and deferred portions of parcels 38 and 56.[46] BLM also placed a lighting restriction on Parcel 71.[47] Parcels 69, 70, and 71 are in close proximity to Dinosaur National Monument.[48] On December 12, 2017, BLM offered leases for 59 parcels for oil and gas exploration, covering approximately 65,000 acres, subject to certain lease terms and conditions.[49]

---

[42] AR017472–73.

[43] AR017473.

[44] AR017428.

[45] AR017176.

[46] AR017465; AR017174–76; *see* AR017398.

[47] AR017534, 17587; *see* AR017665, 17676–77.

[48] AR017450–51. BLM anticipated that any oil and gas development on parcel 71 "would not have an effect on the view shed of Dinosaur National Monument." AR017481.

[49] AR017415-763; AR029335-39.

In the 2008 RMP, these parcels were designated as open for oil and gas leasing.[50] Supporting its decision, BLM issued a FONSI in December 2017.[51] That is, it determined that because there were no significant impacts likely from the lease sale, it did not need to engage in the more extensive EIS process for the lease decision.[52] BLM received successful bids on all 59 offered leases. However, because some bidders failed to make timely payments, eight of the leases were forfeited.[53]

On June 12, 2018, BLM reoffered the eight forfeited leases.[54] BLM prepared a DNA for the 2018 lease sale, indicating the action was supported by existing documents that complied with NEPA.[55] The agency verified the earlier analyses of reasonably foreseeable impacts of the oil and gas leasing and future development.[56] It also determined that an additional NEPA analysis was unnecessary, noting "no changes to the parcels sizes or stipulations and lease notices."[57] The BLM posted a notice of sale and received four protests.[58] Each protest was reviewed and dismissed before BLM issued the eight leases.[59]

---

[50] AR017422-23.

[51] AR029327; AR029335–39.

[52] AR029327–34.

[53] AR031161.

[54] AR031161.

[55] AR031161–204.

[56] AR031162–64.

[57] AR031163.

[58] AR031207; AR029487–98.

[59] AR031207; AR029487–98.

## IV. ANALYSIS

**A. BLM Took a Hard Look at the Emissions and Climate Change Impacts from Oil and Gas Development.**

Plaintiffs contend that Defendants' own air pollution and greenhouse gas modeling forecasted additional ozone pollution resulting from the leases and that the pollution would impact public health, welfare, and public lands. However, to the extent it could without specific proposed oil and gas development information for each lease, BLM considered the foreseeable impacts on air quality, ground-level ozone, greenhouse gas emissions, and climate change.

### 1. BLM Adequately Evaluated Ozone and Greenhouse Gas Emissions.

In October 2008, BLM issued its RMP and EIS for the Vernal Planning Area.[60] It considered the impacts on air quality from anticipated oil and gas development, prescribed burns, growing populations, and alternative energy sources.[61] Subsequently, BLM produced an ARMS model that, among other things, projected ground-level ozone concentrations in the Uinta Basin through 2021.[62] The agency observed that portions of the Uinta Basin recorded "numerous exceedances of the 8-hour ozone standard during the winter months."[63] The 2017 EA incorporated BLM's 2008 RMP and the 2014 ARMS model.[64]

In its 2017 EA, considering the nominated parcels at issue in this case, BLM again noted that methods of analyzing ozone were still developing.[65] It observed that "[w]inter ozone formation is a newly recognized issue, and the methods of analyzing and managing this problem

---

[60] AR00001–2303.

[61] AR001427–28.

[62] *See* AR029015–18; AR029064.

[63] AR017436.

[64] AR017427 (incorporating by reference the RMP); AR017491 (incorporating by reference the ARMS model).

[65] AR017436

are still being developed."[66] Because existing models were "unable to reliably replicate winter

ozone formation," BLM concluded that additional research was needed to identify ground-level

ozone precursor sources.[67] However, BLM generally acknowledged existing ozone data showing

amounts at times exceeding acceptable standards. And it noted that "[e]missions from oil and gas

development on the Colorado Plateau are likely contributing to monitored elevated levels of

ozone; in some locations at levels above the NAAQS," and generally suggested minimum and

enhanced air pollution controls would be applied to oil and gas rigs and operations.[68] However,

BLM noted in response to a comment that a regulatory ozone model was "impractical" for the

area.[69]

     Under the circumstances here, BLM examined relevant data on ozone. It offered a

qualitative assessment of the effects of ground-level ozone and observed that increases could be

expected as an indirect consequence of leasing the parcels when those parcels were developed.

Accordingly, BLM's assessment of ozone was not arbitrary and capricious.

     With respect to greenhouse gas emissions and climate change, BLM observed, "It is now

well established that rising global atmospheric [greenhouse gas] emission concentrations are

significantly affecting the Earth's climate."[70] It also noted that the effects of climate change

"include more frequent and intense heat waves, longer fire seasons and more severe wildfires,

degraded air quality, more heavy downpours and flooding, increased drought, greater sea-level

rise, more intense storms, harm to water resources, harm to agriculture, ocean acidification, and

---

[66] AR017436.

[67] AR017436.

[68] AR029000.

[69] AR001517.

[70] AR017441.

harm to wildlife and ecosystems."[71] BLM explained that global mean surface temperatures increased nearly 1.0°C over the last century and were expected to increase by as much as 5.8°C over the next century as a result of anthropogenic climate change.[72]

In its quantitative assessment, BLM adopted per-well greenhouse gas emissions estimates from a separate study.[73] It estimated the total Greenhouse Gas Warming Potential of greenhouse gas emissions to be "2,284 tons per year (tpy) $CO_2$e for a single oil well, and 2,415 tons per year $CO_2$e for a single gas well."[74] Generally, the $CO_2$e unit, or carbon dioxide equivalent, allows comparison of different greenhouse gases with different warming impacts in the atmosphere. The impact of one metric ton of carbon dioxide, for example, would be expressed as 1 metric ton $CO_2$e, where the same weight of the more potent methane might be expressed as 25 $CO_2$e.[75] In its analysis, BLM expressed carbon dioxide, methane, and nitrous oxide annual emissions as a single number: 2,284 tpy $CO_2$e for an oil well and 2,415 tpy $CO_2$e for a gas well.[76] BLM also anticipated downstream emissions from combustion of the oil and gas products in its 2017 EA, estimating that the per-well products would emit 33,423.94 metric tons of carbon dioxide when ultimately combusted.[77]

Although it provided estimates of greenhouse gas emissions for the RFD, BLM noted that an accurate assessment of greenhouse gas emissions was "not possible at the leasing stage since

---

[71] AR017441.

[72] AR017443.

[73] See AR017472 ("Potential direct and indirect greenhouse gas emissions for a single oil and gas well have been estimated based on the maximum emissions calculated for Alternative D in the Greater Monument Butte FEIS.").

[74] AR017472.

[75] See AR017442. Because the warming potential of a greenhouse gas may vary over its time in the atmosphere, the Greenhouse Gas Warming Potential number may vary depending on the selected timeframe.

[76] AR017472.

[77] See AR017472. BLM only calculated carbon dioxide emissions based on combustion of the product.

emissions are dependent on factors such as specific equipment used and duration of use, applicant-committed emission controls, and the expected production rate from the oil or gas well."[78] These factors and others would depend on the level of actual development on the leased parcels, which is unknown at the leasing stage.[79] BLM used its fixed RFD to estimate the impacts, but noted that actual development could vary, including the possibility of no well development on a leased parcel. Given this limitation, BLM assessed the impacts generally through the lens of its RFD. The court concludes BLM took a sufficiently hard look at the greenhouse gas impacts from its leasing decision.

Relatedly, Plaintiffs argue that the leasing decision should be vacated because BLM failed to provide a cumulative assessment of climate change resulting from the leases.[80] That is, BLM did not place the anticipated greenhouse gas emissions from its leasing decision into the broader regional and historic context. "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."[81] Reviewing the sufficiency of a cumulative-impacts analysis, the court "must examine the administrative record, as a whole, to determine whether the [agency] made a reasonable, good faith, objective presentation of those impacts sufficient to

---

[78] AR017472.

[79] AR017472.

[80] *See* ECF No. 30 at 13–14, 18–25 (arguing that BLM failed to consider the leasing decision's emissions and health impacts when combined with other projects in the Basin); *id.* at 25 ("Without a data-driven comparison of the [greenhouse gas] emissions from the leased parcels to regional and national [greenhouse gas] emissions, BLM had no context for assessing whether [greenhouse gas] emissions from the leased parcels would significantly contribute to climate change.").

[81] 40 C.F.R. § 1508.7.

foster public participation and informed decision making."[82] "A meaningful cumulative impact analysis" must address:

> (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.[83]

In its 2017 EA, BLM observed that "[g]lobal anthropogenic carbon emissions reached about 7,000,000,000 MT per year in 2000 and an estimated 9,170,000,000 MT per year in 2010."[84]And it noted that natural gas systems contributed 162.4 MMT $CO_2e$ of methane in the United States in 2015.[85] BLM explained that greenhouse gases could be expected from construction and operation of wells, vehicles, methane escaping from wells, and combustion of the oil and gas products.[86] And, as explained above, BLM identified the expected emissions under the RFD of 135 wells at 2,284 tpy $CO_2e$ and 2,415 tpy $CO_2e$ for an oil and gas well, respectively.[87] BLM further stated:

> Since climate change and global warming are global phenomena, for purposes of this NEPA analysis, the analysis presented above about the direct and indirect effects of [greenhouse gas] emissions from the Proposed Action is also an analysis of the cumulative effects of the Proposed Action. The BLM has determined that this analysis adequately addresses the cumulative impacts for

---

[82] *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1251–52 (10th Cir. 2011) (citation and internal quotation marks omitted).

[83] *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) (quoting *TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006)).

[84] AR017443 (citing Thomas A. Boden, et al., Global, Regional, and National Fossil-Fuel $CO_2$ Emissions (2013)).

[85] AR017443.

[86] AR017494.

[87] AR017472.

climate change from the Proposed Action, and therefore a separate cumulative effects analysis for [greenhouse gas] emissions is not needed.[88]

With respect to climate change, BLM did not quantitatively analyze the effect of development on the proposed leases on climate. In its 2017 EA, BLM stated, "In light of the difficulties in attributing specific climate impacts to individual projects, it is recommended agencies use the projected greenhouse gas emissions as a proxy for assessing a Proposed Action's potential climate change contribution."[89] Instead of engaging in the speculative assessment of cumulative climate change impacts, BLM evaluated the indirect climate change impacts. It qualitatively described the important aspects of climate change and noted that climate change is "reasonably anticipated to endanger the public health and public welfare."[90] And BLM explained that the important causes of climate change are heat-trapping greenhouse gases.[91] In its $CO_2e$ calculations, explained above, BLM offered a quantitative assessment of the greenhouse gases from the decision to lease.

An agency is not required to engage in analyses, including cumulative impact, if they are "too speculative or hypothetical to meaningfully contribute to NEPA's goals of public disclosure and informed decisionmaking."[92] "NEPA does not require an agency to consider the environmental effects that speculative or hypothetical projects might have on a proposed project."[93] Here, BLM identified the impacts flowing from its decision to lease parcels for oil and gas development and it generally identified the broad global context within which this

---

[88] AR017494 (opening quotation mark omitted).

[89] AR017472.

[90] AR017441.

[91] AR017441.

[92] *Wyoming*, 661 F.3d at 1253.

[93] *Sierra Club v. Lujan*, 949 F.2d 362, 368 (10th Cir. 1991).

decision fits. The court determines that BLM took an appropriately hard look at the cumulative greenhouse gas and climate change impacts of its decision to lease the parcels for oil and gas development.

### 2.   BLM Did Not Violate NEPA By Deferring Part of Its Analysis.

Under NEPA, an agency must consider the reasonably foreseeable impacts of a decision before an "irretrievable commitment of resources occurs."[94] "[T]here is no bright line rule that site-specific analysis may wait until the APD stage."[95]

Plaintiffs argue that the "the leasing decision represents an 'an irrevocable commitment to allow *some*' impacts, because none of the parcels leased in the December 2017 sale are entirely covered by a NSO stipulation."[96] That is, because "[n]one of the parcels BLM leased in the 2017 sale were entirely covered by No Surface Occupancy stipulations," BLM was required to evaluate the impacts to the leased parcels at the leasing stage rather than wait until an Application for Permit to Drill is submitted.[97]

As noted previously, BLM did assess several direct, indirect, and cumulative impacts of leasing the proposed parcels.[98] Among other impacts, BLM analyzed air quality and greenhouse gas emissions using a reasonably foreseeable development scenario (RFD) under which it anticipated at least one well on each parcel and 135 wells in total, with a total surface disturbance of 590 acres.[99] What BLM did not do was evaluate the site-specific additions of greenhouse

---

[94] *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 716 (10th Cir. 2009) (quoting 42 U.S.C. § 4332(2)(C)(v)).

[95] *Id.* at 717–18.

[96] ECF No. 30 at 26; *see id.* at 33 ("BLM again attempts to kick the can down the road and defer any meaningful analysis of its June 2018 leasing decision until it receives individual requests to drill.").

[97] ECF No. 61 at 13.

[98] *See generally* AR017415–17763.

[99] AR017428.

gases from well development and operation. This is because "a lease may be purchased but never developed; a drilled exploratory well may show no potential for development; and the methods of development, equipment used, and operator-committed emissions controls, were not yet known."[100] Indeed, a leaseholder must still submit an application for permit to drill providing the details of its proposed development and BLM retains authority to approve, approve with conditions, or deny the request.[101] At this stage, BLM will conduct more specific analyses of the cumulative impacts of the oil and gas development. Accordingly, the cumulative impact of the activities in question are not beyond the point of regulation when leased.

Relatedly, Petitioners argue a full EIS was necessary instead of an EA and FONSI. "NEPA does not require a fully developed plan that will mitigate all environmental harm before an agency can act; NEPA requires only that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fully evaluated."[102] "Agencies need not prepare a full EIS if they initially prepare the less detailed environmental assessment (EA) and, based on the EA, issue a finding of no significant impact (FONSI), concluding that the proposed action will not significantly affect the environment."[103] In this context, "significantly" is defined to include its intensity or severity, such as the degree to which public health or safety are impacted, or whether the effects are highly uncertain and involve unique or unknown risks.[104] In the Tenth

---

[100] ECF No. 38 at 16; *see* AR017472-73.

[101] *See* 30 U.S.C. § 226(g); 43 C.F.R. § 3162.3-1.

[102] *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 528 (9th Cir. 1994), *as amended on denial of reh'g* (Dec. 20, 1994).

[103] *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006) (brackets, ellipsis, citation, and internal quotation marks omitted).

[104] *See* 40 C.F.R. § 1508.27 (2019).

Circuit, the decision to "issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise."[105]

Petitioners argue that "[t]he leases will further exacerbate the unhealthy levels of ozone pollution in the Uinta Basin, leading to cumulatively significant impacts that adversely affect public health and degrade iconic public lands, like Dinosaur National Monument."[106] By acknowledging exceedances of ozone in the region and its impact on human health, Petitioners contend, BLM should have realized the action threatened violation of environmental laws and thus it should have prepared an EIS (rather than issue a FONSI).[107] But again, BLM considered the available information on air pollutants in the region, including ozone. Consistent with its earlier ARMS model, BLM anticipated that parts of the region would continue to see excessive concentrations of ground-level ozone, particularly in winter. Although it ultimately recognized impacts from the lease sales on air pollutant emissions, it found these impacts were not so significant that a full EIS was required.[108] Among other things, the agency determined that mitigation measures could be applied to the lease parcels to reduce potential impacts, and that industry best practices would be applied in the lease stipulations and APD permits to protect public health and safety.[109] The EA discussion of the array of potential impacts is reasonably complete and adequately inform the BLM decision that the leases would not pose significant impacts on public health and safety. BLM's review of the leasing impacts and its decision to issue a FONSI are not arbitrary and capricious under the circumstances.

---

[105] *Silverton Snowmobile Club*, 433 F.3d at 785 (citation and internal quotation marks omitted).

[106] ECF No. 30 at 28–29.

[107] *Id.*

[108] *See* AR029327–34.

[109] AR029329.

**B. BLM Failed to Consider Reasonable Alternatives.**

NEPA requires agencies to "[e]valuate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination."[110] "The range of alternatives that the agency must consider is not infinite, of course, but it does include all reasonable alternatives to the proposed action."[111] On balance, "an agency need not consider an alternative unless it is significantly distinguishable from the alternatives already considered."[112]

The 2017 EA states that BLM evaluated just two polar opposite alternatives for impacts on a variety of factors, such as air quality, cultural resources, migratory birds, and visual resources: lease all or lease none.[113] The proposed action involved leasing all nominated parcels, as opposed to the no action alternative under which no leases would be offered.[114] BLM explained that it proposed to "lease Federal mineral estate in nominated parcels available for leasing in the resource area as described in section 2.2 and in accordance with the VFO RMP (October 2008)."[115] The agency also stated, "No other alternatives to the Proposed Action were identified that would meet the purpose and need of the Proposed Action."[116]

Commenters proposed various alternatives, in addition to the two binary alternatives studied by BLM. Plaintiffs contend that two of these alternatives were reasonable and should

---

[110] *Davis v. Mineta*, 302 F.3d 1104, 1120 (10th Cir. 2002) ("A properly-drafted EA must include a discussion of appropriate alternatives to the proposed project."), *abrogated on other grounds by Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016).

[111] *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1166 (10th Cir. 2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003).

[112] *Richardson*, 565 F.3d at 708–09.

[113] *See* AR017432–33.

[114] AR017432.

[115] AR017432.

[116] *Id.*

have been analyzed: "Commenters raised two reasonable, middle ground alternatives for the lease sale that would have protected public health and public lands, including (1) deferring parcels within Dinosaur National Monument's viewshed, and (2) deferring parcels that overlap with inventoried lands with wilderness characteristics and Nine Mile Canyon ACEC."[117] Based on the record evidence, the court agrees that these two alternatives were reasonable and therefore require analysis.[118]

Regarding the ACEC alternative, BLM stated that this alternative "is already within BLM's decision authority in the two alternatives analyzed in detail" because, "[f]or example, *if BLM's decision maker preferred to defer leasing* in the ACECs, then the BLM would select in the Decision Record the Proposed Action for the parcels that are outside the ACEC and would select the No Action for the parcels within the ACEC."[119] BLM's response regarding the Dinosaur National Monument alternative is similar.[120] In other words, the lease all or lease none alternatives BLM considered encompass any decision BLM is empowered to make, including leasing some parcels but not others.

BLM's position confuses the power to act with the requirement to analyze. BLM is required to analyze "all reasonable alternatives to the proposed action,"[121] which includes those alternatives that are "significantly distinguishable from the alternatives already considered."[122] Simply stating that it has the power to choose to lease fewer than all of the parcels under

---

[117] ECF No. 30 at 36; *see* ECF No. 1 at ¶¶ 126, 127.

[118] These two alternatives each identified a discrete number of parcels and provided a reasoned basis for why they were significantly distinguishable from the lease all and lease none alternatives analyzed by the BLM. AR041879.

[119] AR017663 (emphasis added).

[120] *Id.*

[121] *Utahns for Better Transp.*, 305 F.3d at 1166.

[122] *Richardson*, 565 F.3d at 708–09.

consideration is not analysis. As the Tenth Circuit has noted, "NEPA has two aims . . . , it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action" and "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."[123] To meet those aims, BLM must both analyze the reasonable alternatives and document that analysis, otherwise it is impossible for the court and the public to know "its decisionmaking process."[124]

The record in this case is unclear as to how much analysis occurred regarding the Dinosaur National Monument and ACEC alternatives. It is clear that BLM did not select the no action alternative, but it also did not lease all nominated parcels identified in the Proposed Action. Instead, it eliminated or deferred leasing several parcels.[125] It removed parcel 70 from consideration because the nominator provided incorrect surface owner information.[126] BLM deferred parcel 69 "pending further coordination with Dinosaur National Monument regarding their comments which call into question the ability of the lease stipulations to protect resources of concern, and which will take additional time to resolve."[127] And BLM imposed a lighting stipulation on parcel 71 "to minimize noise and light pollution using the best available technology to mitigate potential impacts to visitor experiences within Dinosaur National Monument."[128] But the EA does not clearly identify the analysis the BLM performed to arrive at

---

[123] *Wyoming*, 661 F.3d at 1236–37 (citation and internal quotation marks omitted).

[124] *Id.*

[125] AR017543–45.

[126] AR017545 ("This parcel is being removed from the list of lands to be considered for lease, because of incorrect split-estate contact information provided during the nomination."); *see* AR017663.

[127] AR017544–45.

[128] AR017665. BLM applied stipulation UT-S-168 (Controlled Surface Use—Light and Sound: Areas Adjacent to Dinosaur National Monument) and lease notice UT-LN-148 (Dinosaur National Monument—Dark Skies) to parcel 71.

these decisions and in declining to defer leasing or place additional restrictions on other parcels in the Dinosaur National Monument viewshed alternative. The EA also leaves very unclear whether any analysis was performed at all involving the ACEC alternative. Indeed, the "Alternatives Analyzed in Detail" section, which comprises about one page, simply identifies the "No Action" alternative, the "Lease All Nominated Parcels" alternative, and then states that "[n]o other alternatives to the Proposed Action" would be suitable.[129] The court and the public are left to divine from bits and pieces of other sections of the EA, the public comments, and the protests, whether additional analysis actually was performed.[130]

In short, BLM certainly failed to properly document and perhaps failed to perform an analysis of the reasonable alternatives. A critical aim of NEPA is to "ensure[] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."[131] To that end, an agency must evaluate reasonable alternatives to the proposed action, and discuss them "in detail, including the proposed action, so that reviewers may evaluate their comparative merits."[132] The public cannot weigh the merits of an agency decision nor compare it to other alternative actions when the agency offers little or no evaluative basis for its decision. Public knowledge and participation are stifled where, as here, an agency substitutes its power to decide for the rationale behind its decision. "Thus[,] those concerned with the consequences of

---

[129] AR017432-33.

[130] For example, in its comments to the proposed lease sale, the National Park Service expressed concern over oil and gas development emissions (particularly ozone and visibility), the impact of development on scenic vistas within the park or viewsheds, light pollution or artificial sky glow, anthropogenic noise, and potential impact on endangered fish species. AR032574–78. The National Parks Conservation Association protested five parcels near Dinosaur National Park, parcels 63, 64, 65, 67, and 71. AR007245. It was primarily interested in BLM's "analyzing and mitigating potential impacts on night skies, natural sounds and visitor experience related to parcels near Dinosaur National Monument." AR007246. Parcels 63, 64, 69, 70, and 71 are near the DNM boundaries and parcels 65, 67, and 72 are "within line-of-sight between 18 and 28 miles southwest of the Dinosaur Monument." AR017451.

[131] *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 711 (10th Cir. 2010) (internal quotation marks omitted) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)).

[132] 40 C.F.R. § 1502.14(a), (b).

the decision are not given any notice of the relative environmental effects of feasible alternatives."[133] In this case, BLM's analysis fell short of NEPA's requirements.[134]

### C.  BLM's 2018 Lease Decision Did Not Require Additional Analyses.

Petitioners also argue that the 2018 lease sale was improper because BLM relied on the 2017 EA and the 2008 RMP in determining that no new significant information mandated an in depth NEPA analysis.[135] Where a proposed action is essentially similar to an earlier analyzed action, the agency may prepare a Determination of NEPA Adequacy (DNA) and forego additional, unnecessary analyses.[136] Applicable regulations authorize use of "[a]n existing environmental analysis prepared pursuant to NEPA and the Council on Environmental Quality regulations" in its entirety "if the Responsible Official determines, with appropriate supporting documentation, that it adequately assesses the environmental effects of the proposed action and reasonable alternatives."[137]

After the December 2017 lease auction, eight of the fifty-nine properties received successful bids, but BLM did not receive payment. Because these parcel leases were forfeited, BLM made them available again for lease in the July 2018 sale. In doing so, BLM determined that the earlier NEPA documents adequately analyzed the impacts of the new leasing decision.[138] In a completed DNA worksheet, BLM observed there were no changes to the sizes or stipulations of the parcels; no new information would substantially change the analysis; the direct, indirect,

---

[133] *Concerned About Trident v. Rumsfeld*, 555 F.2d 817, 827 (D.C. Cir. 1976) (citing *Iowa Citizens for Envtl. Quality, Inc. v. Volpe*, 487 F.2d 849, 852–53 (8th Cir. 1973)).

[134] *Utahns for Better Transp.*, 305 F.3d at 1166 ("The APA's reasonableness standard applies both to which alternatives the agency discusses and the extent to which it discusses them.").

[135] ECF No. 30 at 31–33.

[136] 43 C.F.R. § 46.120(c); *see Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131, 133 (D.D.C. 2017).

[137] 43 C.F.R. § 46.120(c).

[138] *See generally* AR 031160–204.

and cumulative impact assessments were qualitatively and quantitatively similar; and the public involvement with the earlier NEPA documents was adequate to cover the new decision.[139] As a subset of the original 64 leases studied in the 2017 EA, the 8 leases offered in 2018 had been adequately analyzed.

Nevertheless, Petitioners put forward two bases for the DNA's insufficiency. First, they contend that if the 2017 NEPA documentation was insufficient, the 2018 documentation was necessarily insufficient.[140] The court has determined that the 2017 EA provided an inadequate assessment of alternatives. Accordingly, the 2018 DNA is inadequate insofar as it relies on the 2017 EA.

Petitioners next argue that significant new information had become available and BLM ignored it. Specifically, the EPA formally designated parts of the Uinta Basin as "nonattainment" with the ozone standard under the National Ambient Air Quality Standards (NAAQS). However, before the formal designation, BLM recognized in its 2017 EA that the designation was under consideration by the EPA. It stated, "The Uinta Basin is designated as unclassified/attainment by the EPA under the Clean Air Act."[141] BLM further observed:

> [I]n October 2016, the Governor of Utah recommended that portions of the Basin be classified as non-attainment for the 8-hour ozone standard of 70 ppb. The EPA is reviewing the recommendation and formal designations are anticipated in October 2017.[142]

---

[139] AR031162–64.

[140] ECF No. 30 at 31.

[141] AR017434; AR017734. Those portions of the Uinta Basin below 6,250 feet in elevation received the nonattainment designation for ozone under the NAAQS. ADDITIONAL AIR QUALITY DESIGNATIONS FOR THE 2015 OZONE NATIONAL AMBIENT AIR QUALITY STANDARDS, 83 FR 25776-01. *See* AR017740 ("The pending nonattainment designation for the Basin (October 2017) will impact the regulatory requirements the BLM must address as well as state requirements to bring the area back into attainment. These will be important considerations for future NEPA analysis and cannot be addressed at this time since the designation has not been made.").

[142] AR017434.

BLM also explained that proposed development on the leased parcels would need to provide "emissions inventories" as well as "[a]ir quality dispersion modeling," including "direct and cumulative impact analysis for demonstrating compliance with the NAAQS, plus analysis of impacts to Air Quality Related Values (i.e. deposition, visibility), particularly as they might affect nearby Class 1 areas (National Parks and Wilderness areas)."[143]

Although it did not separately consider the formal nonattainment designation, BLM plainly evaluated ozone and the challenge it poses to air quality and health in the region. Under the ARMS model, the Uinta Basin was expected to exceed ozone standards, at least in winter months, for all analyzed scenarios.[144] BLM noted that Uintah County's monitored ozone design value—a statistic used to support classification of nonattainment areas—was 79 ppb (parts per billion), over the 8-hour ozone standard of 70 ppb.[145] In other words, BLM essentially anticipated the designation was forthcoming and it also considered the relevant data underlying that designation. The EPA's formal recognition of ozone nonattainment in the region does not undermine the BLM's evaluation or require a new analysis. In sum, BLM already considered the ozone exceedances.

BLM's issuance of a DNA for the 2018 lease sale was not arbitrary and capricious, except to the extent that the EA on which it is based failed to address reasonable alternatives.

### D. BLM's Decisions Complied With FLPMA.

Plaintiffs argue that BLM violated FLPMA "[b]y authorizing additional oil and gas leasing in the Uinta Basin without undertaking any efforts to ensure that leasing will not

---

[143] AR017466.

[144] AR017491–AR017493.

[145] AR017436; *see* 80 FR 65292-01 (revising the ozone standard to 0.070 ppm "to provide the appropriate degree of increased public health protection for at-risk populations against an array of adverse health effects").

exacerbate existing violations of federal ozone standards."[146] Generally, public lands should be "managed in a manner which recognizes the Nation's need for domestic sources of minerals," among other resources.[147] With this and other explicitly stated purposes in mind, agencies must prepare land use plans to guide future land management decisions.[148] FLPMA requires that an agency manage lands "in accordance with the land use plans" developed under Section 1712.[149] Once an agency prepares a land use plan through the required studies and public input, the agency may not take actions inconsistent with that plan.[150] Among other directives, Section 1712 requires agencies to ensure "compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans."[151]

Here, BLM issued its relevant land use plan in 2008.[152] In its 2008 RMP, BLM designated approximately 1.7 million acres in the Uinta Basin open to oil and gas development.[153] It noted, "Ozone (a product of biomass combustion formed through the interaction of ozone precursors, volatile organic carbon compounds (VOCs), and nitrogen oxides) is a precursor to greenhouse gases, and a major constituent of photochemical smog."[154] And BLM incorporated an air quality goal in Objective AQ-9, stating:

---

[146] ECF No. 30 at 34.

[147] 43 U.S.C. § 1701(a)(12).

[148] *See generally* 43 U.S.C. § 1712.

[149] 43 U.S.C. § 1732(a).

[150] *Id.*; *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004) ("The statutory directive that BLM manage 'in accordance with' land use plans, and the regulatory requirement that authorizations and actions 'conform to' those plans, prevent BLM from taking actions inconsistent with the provisions of a land use plan. Unless and until the plan is amended, such actions can be set aside as contrary to law pursuant to 5 U.S.C. § 706(2)." (citation omitted)).

[151] 43 U.S.C. § 1712(c)(8).

[152] *See* AR000001–2303.

[153] AR000043–AR000044. Approximately 200,000 acres were made unavailable to oil and gas leasing and the approximately 1.7 million available acres were divided into three different categories based on the severity of restrictions (stipulations) to be imposed on surface disturbing activities. *Id.*

[154] AR000822. This is in its section addressing the impacts of fire decisions, i.e. prescribed burns.

National Ambient Air Quality Standards (NAAQS) are enforced by the Utah
Department of Environmental Quality, Division of Air Quality (UDEQ-DAQ),
with EPA oversight. Special requirements to reduce potential air quality impacts
will be considered on a case-by-case basis in processing land use
authorizations.[155]

In 2017 and 2018 BLM offered oil and gas leases for the parcels at issue in this case. In

its 2017 EA, BLM generally observed that ground-level ozone was exceeding air quality

standards in winter months.[156] It developed Best Management Practices for oil and gas

production to help "reduce impacts to air quality through reduction of emissions, surface

disturbances, and dust from field production and operations."[157] BLM leased all parcels subject

to an Air Quality Stipulation.[158] Accompanying the leases were notices that "site-specific

measures may also be employed to avoid or minimize effects to local or regional air quality,"[159]

that certain "Best Management Practices . . . would be required for any development projects,"[160]

and that "prior to project-specific approval, additional air quality analyses may be required to

comply with the National Environmental Policy Act, Federal Land Policy Management Act,

and/or other applicable laws and regulations."[161]

With these steps, BLM's leasing decision complied with the objectives of its land use

plan as required by the FLPMA. The statute states, in no uncertain terms, that the provision for

compliance with pollution control laws must be considered "[i]n the development and revision of

---

[155] AR000085–6; AR000671–80.

[156] AR017436–37.

[157] AR017467.

[158] *See* AR017512–42; AR017546.

[159] AR006079.

[160] AR006080.

[161] *Id.*

land use plans."[162] And that is what happened here. Accordingly, the 2017/2018 lease decisions were consistent with the 2008 RMP land use plan and, therefore, the actions do not violate FLPMA.

## V. REMEDY

If an agency's action is arbitrary and capricious, the APA requires a court to hold it unlawful and set it aside.[163] In practice, this means the court could (1) remand to BLM with (or without) instructions to take additional actions or steps, or (2) vacate the leases and remand for further study.[164] The Tenth Circuit has observed, "Vacatur of agency action is a common, and often appropriate form of injunctive relief granted by district courts."[165] This equitable authority, of course, requires some consideration of the best means to correct the errant agency decision.[166]

Here, BLM failed to properly analyze two reasonable alternatives for its leasing decisions. Because this failure violated NEPA, the court remands this matter to BLM to conduct and document its reasonable alternatives analysis. The court declines Plaintiffs' request for an order vacating the issued leases. Other than a failure to evaluate or document its analysis of reasonable alternatives to the leasing decision, the court has determined that BLM complied with

---

[162] 43 U.S.C. § 1712(c).

[163] 5 U.S.C. § 706(2)(A). The Tenth Circuit has explained:

> An agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.

*WildEarth Guardians v. United States Bureau of Land Mgmt.*, 870 F.3d 1222, 1233 (10th Cir. 2017).

[164] *See WildEarth Guardians*, 870 F.3d at 1239.

[165] *Id.*

[166] *Id.* at 1240. It is inaccurate to suggest as Respondents do, however, that this form of "injunction" should be analyzed under Rule 65 elements. For example, they argue that Petitioners have not made a "'clear showing' of irreparable harm" absent an injunction. ECF No. 54 at 29. There is no request for preliminary injunction before the court and the well-known Rule 65 analysis does not apply.

NEPA. Second, nothing in the record suggests that, after documenting its analysis of the alternatives, BLM will fail to justify a substantially similar decision.[167] Lastly, the court is persuaded that vacatur in the interim would unnecessarily disrupt the steps already taken toward leasing the unchallenged parcels.[168]

## VI. ORDER

For the reasons stated in this Memorandum Decision and Order, this matter is REMANDED to BLM for further administrative consideration, to include the documentation of a NEPA-compliant analysis of the two identified reasonable alternatives to leasing all nominated parcels. Specifically, the court orders BLM to evaluate deferral or elimination of parcels from leasing consideration based on its assessment of the impacts of oil and gas leasing and anticipated development on (1) Dinosaur National Monument, and (2) lands with wilderness characteristics or Areas of Critical Environmental Concern.

Signed December 10, 2020.

BY THE COURT

David Barlow
United States District Judge

---

[167] *See WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 (D.D.C. 2019) (determining that remand rather than vacatur of oil and gas leases was appropriate because, among other things, "nothing in the record indicates that on remand the agency will necessarily fail to justify its decisions to issue EAs and FONSIs"). At oral argument, counsel for the government proffered that two APD's have been approved by BLM, though neither apply to the challenged parcels, i.e., those within the DNM viewshed or on lands with wilderness characteristics.

[168] The court recognizes that Petitioners challenged the propriety of all leases issued in BLM's 2017 and 2018 sales due to BLM's alleged failure to take a hard look at air quality and climate change impacts. However, the court has determined that BLM's analyses on these issues satisfied NEPA requirements.